IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:12CR144 |
| | ) | |
| RACHEL MASINGENE, | ) | |
| | ) | |
| Petitioner. | ) | |

**MEMORANDUM OPINION**
**(Denying Petition for Writ of Error Coram Nobis)**

Rachel Masingene, a former inmate proceeding by counsel, brings this Motion for Writ of Error Coram Nobis ("Petition for Writ of Error Coram Nobis," ECF No. 91). The Government has responded, asserting that Masingene lacks entitlement to relief through a Petition for Writ of Error Coram Nobis. (ECF No. 102.) By Memorandum Order entered on June 4, 2020, the Court directed the parties to inform the Court as to whether Masingene was still detained, the current status of her deportation proceedings, and what impacts her current status might have on her Petition for Writ of Coram Nobis. Both parties have filed a response. For the reasons set forth below, the Petition for Writ of Error Coram Nobis will be denied.

### I.   BACKGROUND

Masingene was born in the Democratic Republic of Congo ("DRC") but came to the United States as a refugee in 2000 and became a Legal Permanent Resident in 2003. (ECF No. 92–1 at 4.) On June 15, 2012, the Government filed a Criminal Complaint alleging that between March 2012 and May 2012, Masingene and a co-defendant

knowingly persuaded, induced, and enticed an individual to travel in interstate commerce to engage in prostitution, in violation of 18 U.S.C. § 2242(a); and, on May 11, 2012, Masingene and a co-defendant knowingly transported an individual "*who had not attained the age of 18 years*" in interstate commerce with the intent that the individual engage in prostitution, in violation of 18 U.S.C. §§ 2423(a), and 2. (ECF No. 1 at 1 (emphasis added).) A conviction for the charge under § 2423(a) would have subjected Masingene to a mandatory minimum sentence of 10 years or up to life in prison.

On September 17, 2012, the Government filed a Criminal Information charging Masingene and a co-defendant with one count of conspiracy to knowingly transport *an individual* in interstate commerce with the intent that the individual engage in prostitution, in violation of 18 U.S.C. §§ 371, 2421. (ECF No. 22 at 1–2.) On September 27, 2012, Masingene waived indictment and pled guilty to the one-count Criminal Information. (ECF Nos. 25, 26.) the Government's plea offer reduced Masingene's sentencing exposure to a maximum of 5 years by dropping the charge for transporting a minor under § 2423(a).

In the Statement of Facts filed with the Plea Agreement, Masingene agreed that "the following facts are true and correct, and that had the matter gone to trial, the United States could have proven them beyond a reasonable doubt:"

> 1. At all times relevant to the information and statement of facts, the defendant, RACHEL MICHELLE MASINGENE, was an adult female and a resident of North Carolina.
> 2. A juvenile female, JANE DOE, is a victim of the crime alleged herein. At all times relevant to the information and statement of facts, JANE DOE was a resident of Florida, was under the age of 18, and was born in

2

1998. At all time relevant to the information and statement of facts, JANE DOE was thirteen years old.

3. From in or about February or March 2012, through in or about May 2012, in the Eastern District of Virginia and elsewhere, the defendant, RACHEL MICHELLE MASINGENE, did knowingly conspire with Whitney Rachell Hayes ("Hayes") to commit an offense against the United States, namely, knowingly transporting an individual in interstate commerce with the intent that the individual engage in prostitution, in violation of Title 18, United States Code, Section 2421.

In furtherance of the conspiracy, and to effect its objects, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

4. In or about February or March, 2012, the defendant, along with Hayes and Korey Jermaine Reynolds ("Reynolds"), met Jane Doe, who was thirteen years old, in Miami, Florida. Jane Doe was living on the streets at the time and was engaging in prostitution. The defendants, who were working as prostitutes and living in Charlotte, North Carolina, at the time, told Jane Doe about their life working as prostitutes in Charlotte. Reynolds was Hayes's and MASINGENE's pimp.

5. The defendants invited Jane Doe to join them and work as a prostitute in Charlotte, North Carolina. In or about February or March, 2012, Reynolds, Hayes, MASINGENE, and Jane Doe traveled from Miami, Florida, to Charlotte, North Carolina, intending that MASINGENE, Hayes and Jane Doe would engage in prostitution in Charlotte.

6. In or about March and April 2012, advertisements were posted on websites, including www.backpage.com, in which Hayes, MASINGENE, and Jane Doe were advertised as prostitutes. HAYES and Masingene explained to Jane Doe how to work as prostitute using internet postings to solicit potential customers. Specifically, HAYES and Masingene taught Jane Doe how to increase the number of potential customers by posting multiple advertisements using pictures of various females obtained from the internet, and using different names and phone numbers for each advertisement.

7. Jane Doe stayed in various hotels in Charlotte, North Carolina, area, along with MASINGENE and Hayes, where all three engaged in acts of prostitution. MASINGENE, Hayes, and Jane Doe provided the majority of their earnings from prostitution to Reynolds. Jane Doe was informed by Reynolds, MASINGENE and Hayes that Reynolds was saving their earnings from prostitution. On or about May 11, 2012, in Reynolds' vehicle, Reynolds, MASINGENE and Hayes transported Jane Doe from Charlotte, North Carolina, to Richmond, Virginia, with the intent that HAYES, Masingene, and Jane Doe would engage in prostitution in Richmond, Virginia. Upon arrival in Richmond, Virginia on or about May 12, 2012, Hayes paid for a hotel room for Hayes, MASINGENE, and Jane Doe to stay

3

in and to engage in prostitution while in Richmond, Virginia. Advertisements were posted on www.backpage.com, in which Hayes, MASINGENE, and Jane Doe were advertised as prostitutes in the Richmond, Virginia area.

8. While in the Richmond, Virginia area, Jane Doe engaged in numerous acts of prostitution. The majority of Jane Doe's earnings from prostitution were provided to Reynolds. (All in violation of Title 18, United States Code 371).

The actions taken by the defendant as described above were taken willfully and knowingly. The defendant acknowledges that the purpose of the foregoing statement of facts is solely to provide an independent factual basis for her guilty plea. It does not necessarily identify all of the persons with whom the defendant might have engaged in illegal activity.

(ECF No. 27 at 1–3.)

In the Presentence Investigation Report ("PSR"), the Probation Officer calculated Masingene's Criminal History Category at I with an Adjusted Offense Level of 28; however, by pleading guilty she received a 3-point reduction for acceptance of responsibility, resulting in a Total Offense Level of 25. (ECF No. 37 at 29–30.) The Probation Officer recommended a sentence between 57 to 71 months of incarceration but restricted it to 57 to 60 months due to the statutory maximum of 5 years. (*Id.* at 29.) The Probation Officer also recommended 1-3 years of supervised release. (*Id.*)

During sentencing, Masingene argued that she qualified for a two-level minor role reduction in her offense level. (ECF No. 102–1 at 71.) The Court agreed, determining that the appropriate guideline range was 46 to 57 months of incarceration. (*Id.* at 80.) Masingene moved for a downward variance and the Court granted the motion based upon based upon her lesser role in the offense, her lack of education, her "unfortunate background," and her mental health. (*Id.* at 122–25.) The Court determined that a Total Offense Level of 20, with a Criminal History Category of I was appropriate, resulting in a

4

guideline range of 33 to 41 months. (*Id.*) On February 14, 2013, the Court entered judgment against Masingene and sentenced her to 36 months of incarceration to be followed by 3 years of supervised release. (ECF No. 73 at 2–3.) Masingene did not appeal. Masingene was released from criminal custody to serve the term of supervised release on December 24, 2014. (ECF No. 92 at 13.)

In February 2018, while Masingene was on supervision, she was arrested for violating the conditions of her supervised release including by, *inter alia*, missing counseling appointments, leaving the jurisdiction, and using drugs. (ECF No. 92–5 at 4.) Nearly four years after her release from criminal custody, Masingene was detained by United States Immigration and Customs Enforcement ("ICE") in late September 2018. (*Id.*) Masingene was found to be a deportable alien subject to removal under the Immigration and Nationality Act due to aggravated felony conviction.[1] (*See* ECF No. 92–1 at 4.) During her detention, Masingene filed this Petition for Writ of Error Coram Nobis, contending that her counsel rendered ineffective assistance by failing to inform her of the immigration consequences of her guilty plea, namely, that she would face mandatory deportation. (ECF No. 92, at 10–14.)

Subsequently, on February 12, 2020, the Immigration Court ordered her to be released from detention, and Masingene was released from detention on or around February 20, 2020. (ECF No. 110–2; *see* ECF No. 113 at 1.) The Immigration Judge denied Masingene's application for asylum and her application for withholding of

---

[1] Any alien convicted of an "aggravated felony" is deportable. 8 U.S.C. § 1227(a)(2)(iii).

removal because she was convicted of a "particularly serious crime." (ECF No. 110–2 at 5–6.) Nevertheless, the Immigration Judge granted Masingene's application for deferral of removal under the Convention Against Torture because Masingene demonstrated that it was "'more likely than not' that [she] will be tortured if she were return to the DRC" due to her sexual orientation. (*Id.* at 7–10.) Therefore, Masingene has been released from detention and her removal has been deferred indefinitely.[2]

### III. ANALYSIS

In her Petition for Writ of Error Coram Nobis, Masingene contends that her counsel rendered ineffective assistance by failing to inform her of the immigration consequences of her guilty plea, namely, that she would face mandatory deportation. (ECF No. 92 at 5.) Masingene contends that she is entitled to bring a Petition for Writ of Error Coram Nobis in light of the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356 (2010). In *Padilla*, the Supreme Court held that the Sixth Amendment requires

---

[2] As Masingene is no longer in custody, the Government argues that
> even though the Immigration Court only ordered MASINGENE's removal be deferred and not withheld, and such deferral could theoretically be vacated at some future date, such a development seems doubtful. As stated in the Immigration Court's Order, "the Congolese government has not made any efforts at all to reduce discrimination and violence against homosexual individuals . . . . Consequently, vacating the petitioner's removal order would only occur in the unlikely event that the Congolese government were to make drastic changes in their human rights record.

(ECF No. 110, at 2.) The Government concludes that Masingene's Petition for Writ of Error Coram Nobis appears to be moot because she has been allowed to remain in the United States indefinitely, and it is doubtful that Congo will sufficiently improve their human rights record in the near future making her removal unlikely. (*Id.* at 3.) The Court agrees that it could find that the Petition for Writ of Coram Nobis is moot at this juncture, and that Masingene could file a new Petition for Writ of Error Coram Nobis at some hypothetical date in the future if her removal ever became imminent. Nevertheless, because Masingene is not entitled to coram nobis relief, the Court declines to find her petition moot.

6

an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea. *See id.* at 373–74. Masingene argues that she did not make an earlier challenge to her guilty plea and sentence because she was not seized for deportation until September 2018, and "[t]his was the first time that [she] learned she had pled to a crime that would result in her mandatory deportation. Prior to that moment, she did not know that she faces automatic deportation, and no one advised her of such." (ECF No. 92, at 14 (citing Ex. E, ¶ 15).) As discussed below, Masingene's statement is belied by the record.

> An individual seeking coram nobis relief must satisfy four threshold prerequisites:
>
> First, a more usual remedy (such as habeas corpus) must be unavailable; second, there must be a valid basis for the petitioner having not earlier attacked his convictions; third, the consequences flowing to the petitioner from his convictions must be sufficiently adverse to satisfy Article III's case or controversy requirement; and, finally, the error that is shown must be "of the most fundamental character."

*Bereano v. United States*, 706 F.3d 568, 576 (4th Cir. 2013) (quoting *United States v. Akinsade*, 686 F.3d 248, 252 (4th Cir. 2012)). Masingene has established that the removal consequences of her conviction satisfy the case or controversy requirement and "a more usual remedy" is not available as she is not "in custody" and cannot file a habeas petition. *See Akinsade*, 686 F.3d at 252. However, Masingene fails to satisfy the second and fourth requirements because she lacks a valid basis for not attacking her conviction at an earlier time and the error is not of a "most fundamental character." *See id.*

The Fourth Circuit has explained that, "[a]though there is no firm limitation of time within which a writ of *coram nobis* will lie, petitioners are required to demonstrate

7

'sound reasons exist[] for failure to seek appropriate earlier relief.'" *United States v. Rocky Mountain Corp.*, 442 F. App'x 875, 876 (4th Cir. 2011) (second alteration in original) (quoting *United States v. Morgan*, 346 U.S. 502, 512 (1954)). Masingene fails to pinpoint with certainty when she actually learned the immigration consequences of her guilty plea. Masingene indicates that she "do[es] not think" that her counsel, Valencia Roberts, ever mentioned the immigration consequences of her guilty plea or that she could be removed to DRC. (ECF No. 92–5 at 3.) Masingene avers that the first time that she ever "heard the word 'ICE' was after sentencing," from her prison case manager who told her that she was subject to an "'ICE hold.'" (*Id.*) In December 2014, two weeks before she was released from prison, her case manager informed her that "the ICE hold was gone." (*Id.*) Masingene contends that she "did not know ICE was with immigration, and it meant [she] would be sent back to the DRC." (*Id.*) Although Masingene states that none of this was explained to her, she does not indicate that she took any initiative to learn what any of this meant at the time. (*Id.*)[3] Masingene contends she learned that she "was 'removable' . . . . because of her conviction" in September 2018 when an ICE officer at the jail came to talk to her. (*Id.* at 4.)

Ms. Roberts asserts that she had represented Masingene for more than a month before she learned Masingene's citizenship status through Masingene's school records and social services. (ECF No. 92–6 at 2.) Ms. Roberts indicated that she was surprised

---

[3] Masingene's current counsel makes much of Masingene's intellectual disability to explain why she would not understand what the terms meant. However, Masingene clearly retained enough information about ICE and "ICE holds" to swear out a declaration four years later.

8

that Masingene had not informed her that she was an immigrant, as, up to that point, Ms. Roberts believed Masingene to be a United States citizen. (*Id.* at 3.) Masingene indicates that Ms. Roberts told her was from the DRC during their discussions. (ECF No. 92–5 at 3.) Ms. Roberts avers that "[b]ecause she did not learn of Ms. Masingene's immigration status until late in my representation of her, [she] was not focused on the immigration consequences in this case. Rather, the plea negotiations were focused on Ms. Masingene's history of abuse, intellectual difficulties, and exploitation in the sex trade." (ECF No. 92–6 at 3.) Ms. Roberts had "no specific recollection of talking with Ms. Masingene about the immigration consequences of pleading guilty prior to her guilty plea" and she had no notes in her file indicating that she had advised Masingene of potential immigration consequences or "that she was subject to deportation if she pled guilty to the offense." (*Id.*) Ms. Roberts indicates that she traveled to Charlotte to meet Masingene's parents in January 2013, prior to sentencing, in order to learn more of her past. (*Id.*) At most, Ms. Roberts states that her file shows that she requested Masingene's alien file from ICE in 2013 following sentencing. (*Id.*) She notes, "'[i]n sum, although I believe the negotiated plea agreement was the best deal I could get for my client, I do not recall advising Ms. Masingene that the crime was a deportable offense or otherwise might have adverse immigration consequences." (*Id.* at 4.)

While Ms. Roberts has no specific recollection of explaining the immigration consequences of her guilty plea, the record demonstrates that Masingene was aware that she was not a United States citizen and was warned of potential immigration consequences several times during her criminal proceedings. The Court initially warned

9

Masingene about the immigration consequences she might face during the Rule 11 hearing. Masingene readily acknowledged that she was not a U.S. citizen. (*Id.*) Thereafter, the Court explained as follows:

> THE COURT: You understand that if you're not a U.S. citizen your plea of guilty to this charge could have immigration consequences? Have you discussed those with Ms. Roberts?
>
> MS. MASINGENE: Yes, sir.
>
> THE COURT: It is possible that you could be deported as a result of this conviction. And should you ever apply for U.S. citizenship, your felony conviction could be used against you and would prejudice your right to become a U.S. citizen, do you understand?
>
> MS. MASINGENE: Yes, sir.
>
> THE COURT: Do you also understand that if you are deported and illegally reenter the United States, this conviction could enhance your punishment you receive for your illegal reentry, do you understand that?
>
> MS. MASINGENE: Yes, sir.

(*Id.* at 15.)

The PSR specifically states that "Immigration and Customs Enforcement (ICE) records reflect that the defendant is legally residing in the United States as a permanent resident; however, if convicted of a felony offense, she may be amenable to removal proceedings for violations of the Immigration Act." (ECF No. 37 at 18.) At that juncture, it was abundantly clear to anyone who read and reviewed the PSR that Masingene was not a United States citizen and faced potential removal. During sentencing, Ms. Roberts stated that she had ample opportunity to discuss the PSR with Masingene and she had no additions or corrections. (ECF No. 102–1 at 3–4.) Immediately after the Court sentenced Masingene and informed her of the terms of her supervised release, the Court specifically stated to Masingene:

10

> Now, I mentioned to you that you are to report to the U.S. Probation Office within 72 hours of your release. It may very well be because of your immigration status that you may be deported to your native country. I do not know. That's up to an immigration judge to make that decision. But if you are released either from the Bureau of Prisons or from the immigration service, within 72 hours I want you in front of the U.S. probation officer. They will go over with you all of the terms and conditions of your supervised release and you will sign these. And Ms. Roberts will tell you, they are very strictly enforced. I don't want any excuses. When they tell you to do something, you do it.

(ECF No. 102–1, at 128–29.) After reviewing specific terms of supervised release, the Court again emphasized:

> And lastly, and most importantly, perhaps you will be required upon completion of your sentence to present yourself to a duly authorized immigration official of the United States Department of Homeland Security to determine whether or not you should be deported to your native country. That is a decision that will be made by the immigration authorities and not by this Court. But if you are deported to your native country, remember you may not return without the authority of the Secretary of Homeland Security of the Attorney General of the United States, or their duly authorized representative.

(ECF No. 102–1, at 130–31.)

Contrary to Masingene's statements that she only learned she was deportable due to her guilty plea when she met with ICE in September 2018, the Court explicitly warned her of these consequences at sentencing on February 13, 2013. Indeed, the Court specifically informed Masingene that "you may be deported to your native country" (ECF No. 102–1, at 128), and that Masingene was required to surrender herself to immigration officials after she completed her terms of imprisonment. By the conclusion of her sentencing, Masingene clearly had been warned several times that she faced potential deportation. In fact, Ms. Roberts explained that, after sentencing, she obtained

11

Masingene's alien file from ICE. Although it is unclear why Ms. Roberts obtained the file at that juncture or whether she discussed it further with Masingene, the factual basis of Masingene's claim that counsel failed to warn her that of immigration consequences was available to Masingene as of February 13, 2013.

To the extent that Masingene argues that Ms. Roberts failed to explain immigration consequences prior to her plea, the Court provided her with very specific warnings at sentencing prior to entering judgment. Therefore, Masingene clearly could have raised her ineffective assistance of counsel claim to challenge to her conviction as of her February 13, 2013 sentencing, either through a direct appeal from the judgment or a motion to vacate under 28 U.S.C. § 2255. *See Colon v. United States*, 708 F. App'x 125, 125–26 (4th Cir. 2018) (citing *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010); *United States v. Ubakanma*, 215 F.3d 421, 424–25 (4th Cir. 2000)). Masingene failed to file these challenges.

Additionally, the record does not reflect that she would have experienced any immigration consequences until she violated the terms of her supervised release. Simply because ICE did not pursue her deportation until September 2018, does not amount to a "sound reason[] . . . for fail[ing] to seek appropriate earlier relief." *Rocky Mountain Corp.*, 442 F. App'x at 876 (citation omitted). Masingene's "subjective uncertainty regarding whether immigration authorities would initiate removal proceedings against her does not qualify as a valid reason for waiting [nearly five] years to challenge her conviction." *Colon*, 708 F. App'x at 126 (citing *Mendoza v. United States*, 690 F.3d 157, 160 (3d Cir. 2012)). With her untimely petition, Masingene fails to establish the second

requirement to seek relief by way of coram nobis. Accordingly, for this reason alone the Petition for Writ of Error Coram Nobis may be denied.

Masingene also fails to establish the fourth requirement and demonstrate the alleged error of counsel was "of the most fundamental character." *Bereano*, 706 F.3d at 576 (quoting *Akinsade*, 686 F.3d at 252). "[A]n error 'of the most fundamental character' is one that has 'rendered the proceeding itself irregular and invalid.'" *Id.* (quoting *United States v. Mayer*, 235 U.S. 55, 69 (1914)). Masingene contends that Ms. Roberts' alleged failure to advise her that her guilty plea carried a risk of deportation was ineffective assistance of counsel. To determine whether the error was "of the most fundamental character," the Court must examine the merits of Masingene's ineffective assistance of counsel claim to ascertain whether Masingene was prejudiced by counsel's alleged error. *Akinsade*, 686 F.3d at 253.

A convicted defendant demonstrates ineffective assistance of counsel by showing that, first, counsel's representation was deficient and, second, the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Padilla*, "counsel must inform her client whether [her] plea carries a risk of deportation," thus, the Court assumes counsel was deficient.[4] 559 U.S. at 374. The prejudice

---

[4] Ms. Roberts avers that Masingene was not forthcoming about the fact that she was not a United States citizen. (ECF No. 92, at Ex. F, at 1.) It is unclear when Ms. Roberts learned Masingene's immigration status, but it occurred "late" or "more than a month" into her representation. (ECF No. 92–5 at 1.) Nevertheless, it appears that counsel was aware that Masingene was not a citizen prior to entry of her guilty plea and should have advised Masingene of the immigration consequences her guilty plea. *See Padilla*, 559 U.S. at 370 (explaining that counsel was deficient when the consequences of the plea "could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's [false assurance

13

component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If the ineffective assistance of counsel claim is readily dismissed for lack of prejudice, it is not necessary to determine whether counsel performed deficiently. *Id.* at 697.

In the context of a guilty plea, the Supreme Court modified the second prong of *Strickland* to require a showing that "there is a reasonable probability that, but for counsel's errors, [petitioner] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Any assertion by Masingene that she would not have pled guilty if she had received better assistance from counsel is not dispositive of the issue. *See United States v. Mora-Gomez*, 875 F. Supp. 1208, 1214 (E.D. Va. 1995). Rather, "[t]his is an objective inquiry and [highly] dependent on the likely outcome of a trial had the defendant not pleaded guilty." *Meyer v. Branker*, 506 F.3d 358, 369 (4th Cir. 2007) (internal citation omitted) (citing *Hill*, 474 U.S. at 59–60). The Court looks to all the facts and circumstances surrounding a petitioner's plea, including the likelihood of conviction and any potential sentencing benefit to pleading guilty. *See id.* at 369–70. In conducting the foregoing inquiry, the representations of the defendant, her lawyer, and the prosecutor during the plea proceedings, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any

---

that his conviction would not result in removal] was incorrect"). *Padilla* did not address the issue of prejudice. *See id.* at 358.

subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). Thus, "[a]bsent clear and convincing evidence to the contrary, a defendant is bound by the representations [she] makes under oath during a plea colloquy." *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1299 (4th Cir. 1992) (citations omitted).

Masingene fails to establish any prejudice resulting from counsel's failure to ensure her client understood the immigration consequences of her guilty plea. Masingene indicates that she "do[es] not think" that Ms. Roberts ever mentioned the immigration consequences of her guilty plea or that she could be removed to DRC. (ECF No. 92–5 at 3.) Ms. Roberts agrees she has no recollection of explaining that Masingene could be deported. However, as discussed above, the Court told Masingene about the potential deportation at the Rule 11 hearing, explicitly stating that, if she entered into the guilty plea, she could be deported if she was not a United States citizen. (ECF No. 85 at 15.) This was a true, and accurate warning by the Court. Masingene agreed under oath during the plea hearing that she understood she could be deported. (*Id.*) Her subjective belief or understanding at that time that she would be deported is insufficient to establish prejudice. Rather, Masingene is bound by her statements under oath. *See United States v. Hernandez-Monreal*, 404 F. App'x 714, 715 (4th Cir. 2010) (explaining that a defendant "affirmatively acknowledg[ing] his understanding that his plea 'could definitely make it difficult, if not impossible, for [him] to successfully stay legally in the United States'" sufficient to cure counsel's error).

Masingene's decision to plead guilty was not based upon counsel's incorrect advice that the offense of conviction was not a deportable offense, nor did she

15

specifically plead guilty to an offense that was intended to remove immigration consequences. In *Padilla*, and in several cases where the Fourth Circuit has granted relief, counsel provided the defendant with *false assurances* that they would not be deported if they pled guilty to a certain offense, and these assurances informed the defendant's decision to plead guilty. In these instances, the Fourth Circuit found that the district court's general warnings during the Rule 11 hearing that a defendant may face immigration consequences were insufficient to cure the incorrect advice of counsel. *See Akinsade*, 686 F.3d at 248, 250 (finding counsel's explicit and plainly wrong assurances that the defendant could not be deported if he pled guilty was an error of the "most fundamental character," and a district court's "admonishment touch[ed] on the consequence of deportation but [di]d not correct the particular misadvice given by counsel"); *cf. United States v. Swaby*, 855 F.3d 233, 240 (4th Cir. 2017) (finding that counsel's "false assurance" that the defendant could not be deported for the offense in the guilty plea that was specifically designed to avoid mandatory deportation prejudiced the defendant).

Here, Ms. Roberts did not provide affirmative misadvice that Masingene could not be deported if she pled guilty and Masingene did not rely on any such misadvice in her decision to enter her guilty plea. Rather, Ms. Roberts could not recall whether she explained immigration consequences to her client. Thus, the Court's general warning that Masingene could be deported[5] if she was not a citizen should have tipped off a

---

[5] In *Swaby*, a panel of the Fourth Circuit makes much of the fact that the district court did not make it clear during the Rule 11 hearing that deportation was *mandatory* or "that he was

16

reasonable defendant who knew that she was not a citizen[6] to inquire further about these consequences.

Moreover, coupled with the district court's warning during the Rule 11 hearing, Masingene fails to demonstrate that, but for counsel's allegedly deficient advice, she would have pled not guilty and insisted on proceeding to trial. Masingene suggests that "faced with the threat of being returned to a country where she . . . has no family, and where she and her family experienced incredible violence, Petitioner would have gone to trial." (ECF No. 92, at 19.) However, Masingene's assertion is not dispositive of the issue. *See Mora-Gomez*, 875 F. Supp. at 1214. To the contrary, no reasonable defendant in Masingene's position would have gone to trial. Had Masingene gone to trial, it was highly likely that a jury would have convicted her of transporting a minor in interstate commerce with the intent that the individual engage in prostitution. Masingene traveled

---

pleading to a crime that rendered him automatically deportable," and instead, instructed the defendant about a *risk* of deportation. 855 F.3d at 237–38, 240. However, it also states that deportation is not truly mandatory but, "is so likely for those convicted of an aggravated felony that it is *akin* to 'mandatory deportation.'" 855 F.3d at 237 (citing *Akinsade*, 686 F.3d at 254). It is unclear how a district court could ever advise a defendant during a Rule 11 hearing that deportation will be mandatory, a fact that neither the Court, nor counsel could predict for certain at that juncture. Indeed, as it turns out, advising Masingene that her deportation would be mandatory would have turned out to be false, as she has been released and is not presently subject to mandatory deportation. Accordingly, the Court's warning that she faced a risk of deportation was an accurate statement.

[6] Masingene contends that she thought of herself as from Alabama and that she "never understood that [she] was not a citizen of this country." (ECF No. 92–5, at 2.) However, she admits that she knew her family was from Africa, and that she remembers her parents taking a test for citizenship, but she never took one "because she did not think she needed to do anything else." (*Id.*) She contends that counsel told her that she was from the DRC. (*Id.* at 3.) Thus, it is clear that the two must have discussed that Masingene was not a citizen of the United States during her criminal proceedings.

from Miami with a thirteen-year-old and assisted with teaching her how to engage in prostitution. Masingene also was implicated by the lead defendant and co-defendant who both pled guilty and agreed to cooperate. (*See* ECF No. 102 at 12.) Based on the evidence, she was clearly guilty of that offense. If convicted, Masingene would have faced a 10-year mandatory minimum sentence or up to life in prison *and* mandatory deportation. By pleading guilty to the criminal information that removed the offense involving transportation of a minor and waiving indictment, Masingene capped her sentencing exposure to 5 years of incarceration. After receiving a downward variance, she was given a lenient 36-month sentence. Ms. Roberts still agrees that entering into the plea agreement was Masingene's best option. (ECF No. 92, at Ex. F, at 1.) Thus, Masingene fails to establish a reasonable probability that she would have pled not guilty and insisted on proceeding to trial if counsel had provided her with advice about the prospect of deportation. *See Mora-Gomez*, 875 F. Supp. at 1214–15.

Indeed, regardless whether Masingene ultimately pled guilty or had instead gone to trial, she would have faced immigration consequences because she is not a United States citizen.[7] Masingene committed an aggravated felony—a deportable offense—and fails to establish that, but for any deficient advice of counsel, she would have been able to avoid immigration consequences by proceeding to trial. As Masingene cannot show that

---

[7] Additionally, Masingene cannot show a reasonable probability that she could have negotiated a plea agreement that would have removed the potential for deportation. *See Colon*, 708 F. App'x 125, 126. Masingene shows neither a "resolute intent to structure a plea agreement that avoided immigration consequences," nor a "reasonable probability 'that the prosecution would have accepted, and the court would have approved, a deal that had no adverse effect on [Masingene's] immigration status.'" *Swaby*, 855 F.3d at 241 (quoting *Kovacs v. United States*, 744 F.3d 44, 52 (2d Cir. 2014).

18

the alleged error of counsel was "of the most fundamental character," *Bereano*, 706 F.3d at 576 (citation omitted), she fails to demonstrate that she is entitled to coram nobis relief.

### III. CONCLUSION

As explained above, Masingene fails to satisfy the requirements for obtaining coram nobis relief. Accordingly, the Petition for Writ of Coram Nobis (ECF No. 91) will be denied. The action will be dismissed.

An appropriate Order shall accompany this Memorandum Opinion

                                                            /s/
                                         Henry E. Hudson

Date: **Nov. 17, 2020**            Senior United States District Judge
Richmond, Virginia